UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEANNE BARRAGAN, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>CITY OF EUREKA, et al.,<br><br>    Defendants. | Case No. 15-cv-02070-WHO<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 31 |

## INTRODUCTION

Defendant police officer Stephen Linfoot shot and killed Thomas McClain (McClain) in Eureka, California on September 17, 2014. McClain's parents brought suit, asserting claims for Linfoot's pre-shooting conduct and ones related to his alleged excessive force.[1] Although Linfoot seeks summary judgment, disputes of material fact exist regarding the actions of McClain preceding and during the time Linfoot fired his gun. Accordingly, his motion is DENIED on the claims of excessive force under federal and state law, the wrongful death claims, and the Bane Act claim based on excessive force. No material disputes of fact have been raised to prevent granting summary judgment to Linfoot on plaintiffs' false arrest/false imprisonment claims under federal and state law and plaintiffs' negligence claim based solely on pre-shooting conduct. Therefore, Linfoot's motion is GRANTED in part and DENIED in part.

## BACKGROUND

In the early hours of September 17, 2014, police officers were conducting surveillance in Eureka, California in an attempt to serve an arrest warrant. Deposition of Stanley Harkness

---

[1] Initially, plaintiffs named the City of Eureka as a defendant. In their Opposition, however, plaintiffs abandoned their *Monell* claims and the claim for denial of medical care under 42 U.S.C. § 1983. Oppo.2. The only remaining defendant is Linfoot.

1   (Declaration of Nancy K. Delaney, Ex. B) at 26:8-14; Deposition of Ryan McElroy (Delaney
2   Decl., Ex. C) at 33:1-9.  Officers observed McClain, who was outside the duplex where he was
3   staying and who was not under surveillance and not the subject of the arrest warrant, have a verbal
4   "confrontation" with a neighbor.  McElroy Depo. at 46:19; Harkness Depo. at 31:5-21.  After the
5   confrontation was over, officers observed McClain make hand movements at or near his waistband
6   and saw an object protruding from his waistband, leading officers to believe McClain had a
7   concealed weapon.  Harkness Depo. at 31:1-7, 32:6-17.  Harkness and McElroy alerted fellow
8   officers in the area that McClain had a weapon.  Harkness Depo. at 32:18-33:12; Deposition of
9   Brian Stephens (Delaney Decl., Ex. D & Declaration of Dale K. Galipo, Ex. 3) at 16:18-17:10.
10  After a patrol car drove by the duplex, McElroy saw McClain remove a gun from his waistband
11  and "rack" the slide.  McElroy Depo. 50:14-16; *see also* Harkness Depo. 33:17-23. Each of the
12  officers who was either in the area for surveillance or responded to the area saw what they
13  believed to be a handgun in McClain's waistband.  Harkness Depo. 32:6-12; Deposition of
14  Stephen Linfoot (Delaney Decl., Ex. A & Galipo Decl., Ex. 2) at 17:5-24; McElroy Depo. at 47:6-
15  14; Stephens Depo. at 17:17-25.

16       Linfoot responded to a call to come to the front of duplex, which he did.  Linfoot Depo. at
17  32:20-23, 49:3-9.  The responding officers confronted McClain and instructed him to "KEEP
18  YOUR HANDS UP" and to "GET DOWN HERE," which according to the officers meant that
19  McClain was supposed to come down from the yard (which was on a slope) to the sidewalk or
20  street.  Stephens Depo. at 9:8-11, 20:5-6; Linfoot Depo. at 14:24-15:2, 15:16-23, 29:1-4, 29:17-
21  30:4.  At least two different officers at least twice yelled at McClain to keep his hands up because
22  McClain's hands were dropping.  McElroy Depo. 47:18-21, 48: 7-8, 48:22-49:8; Stephens Depo.
23  20:5-15; Linfoot Depo. at 14:7-10, 50:3-7.  McClain complied both times and re-raised his hands.
24  He also began to comply with the command to come down from the yard towards the officers.
25  McElroy Depo. 49:2-13; Linfoot Depo. at 16:15-17:1, 29:5-11, 44:13-22, 53:18-22.

26       Within seconds, according to the officers, McClain dropped his hands again and reached
27  for his waistband.  Stephens Depo. at 21:5-9, Linfoot Depo. 45:9-16.  The officers testified that
28  they believed McClain was reaching for his gun and his hands had reached his waistband area.

2

Stephens Depo. at 21:5-9; Linfoot Depo. at 41:14-19, 46:2-11.  Officers shouted "GET DOWN" and "STOP" or "DON'T."  Galipo Decl., Ex. 1 (Dash Cam video).  Linfoot was ten to fifteen feet away from McClain.  He believed that McClain was reaching for or had reached his gun, and shot and killed McClain.  Linfoot Depo. at 9:14-16.   He did not give a warning to McClain that he was going to shoot.  Linfoot Depo. at 10:22-24.  He was the only officer to shoot and he fired seven rounds.  Linfoot Depo. 8:17-20, 12:16-18.  He estimated that the time between when he first saw McClain and when he fired his gun was about 30 seconds.  Linfoot Depo. at 15:3-8.  It is unclear which of Linfoot's shots hit McClain first, but at least one shot went through McClain's upper right arm and into his chest, indicating that McClain's upper right arm was parallel with his chest at that moment.  Declaration of Don S. Cameron, Ex. A (Summary of Evidence) at 5; Deposition of Alexander Jason (Delaney Decl., Ex. E & Galipo Decl, Ex. 5) at 19: 23-25, 45:24-46:16.

Plaintiffs' police practices expert contends that the commands shouted to McClain by different officers were "conflicting," including "get down here," "get down," "keep your hands up," and "stop."  Declaration of Roger A. Clark ¶ 12.  Clark declares that McClain could not comply with "get down" and "keep your hands up" at the same time, and that McClain may reasonably have been attempting to get down on the ground (and dropping his hands as necessary to get down on the ground) in response to the commands when he was shot.  *Id*. ¶¶ 12, 14, 16.  Defendants contest whether any officer ever said "get down here on the ground" (as plaintiffs' expert believes) and deny that the commands given were conflicting.  Defendants' Reply at 1.

An eye witness, Nichole Mottern, who lived in the house where McClain was staying, saw the shooting and testified that McClain was complying with the officers' commands to walk towards them with his hands up.  Declaration of Nichole Mottern (Dkt. No. 32-1), ¶ 3.  Mottern testified that McClain did not reach for anything or make any movement towards his waistband.  *Id*. ¶ 6.  Mottern believes McClain's hands were out and visible; she could see his hands the whole time and he never had anything in them.  *Id*. ¶ 8.  Mottern also testified that the officers were yelling at "them" to do different things, "to get down, to come toward them, and for our hands to be up."  *Id*. ¶ 2.  Linfoot challenges the relevance of Mottern's declaration testimony regarding "conflicting commands," arguing that by referring to "them" Mottern must be referring to the time

3

1  period after the shooting, because Mottern admitted in her statement made to police shortly after
2  the shooting that no commands were directed at her or anyone else at the duplex until after the
3  shots that killed McClain were fired. Reply at 2, n.2 & 5.

**DISCUSSION**

**I.  FEDERAL CLAIMS**

**A.  Unlawful Detention/Arrest in Violation of the Fourth Amendment**

Plaintiffs argue that there were no grounds to detain McClain because the "gun" McClain had was only a replica and McClain never threatened anyone with it or drew it out. However, as Linfoot points out, even if the officers did not have a good faith basis for believing the firearm in McClain's waistband was real, California Penal Code section 20170, prohibits the public exposure or display of a replica firearm in a front year. And at least two officers testified that they saw McClain remove the gun and "rack" the slide while McClain was in the yard in public view and in response (according to one officer) to a patrol car's drive by. McElroy Depo. 50:14-16; Harkness Depo. 33:17-23. The fact that Linfoot did not personally see McClain display or expose the gun does not mean he in conjunction with the officers who did see that conduct lacked probable cause to detain McClain under § 20170.

Plaintiffs also argue the scope and manner of the detention – Linfoot training his gun on McClain for 30 seconds while officers were shouting conflicting commands, and then shooting him – violated the Fourth Amendment. The only case relied on by plaintiffs for the proposition that "there are limitations on both the length of the detention and the manner in which it is carried out," *United States v. Holt*, 264 F.3d 1215, 1229 (10th Cir. 2001), simply recognized that the "reasonableness of a traffic stop based on probable cause must be judged by examining both the length of the detention and the manner in which it is carried out." *Id*. at 1230; *see also id.* at 1228 (applying the "investigative detention" framework of *Terry v. Ohio*, 392 U.S. 1 (1968) to determine the reasonableness of a traffic stop search or seizure by (i) asking whether the officer's action was justified at its inception, and (ii) whether it was reasonably related in scope to the circumstances which justified the interference in the first place.").

There are multiple problems with plaintiffs' reliance on *Holt*. The detention of McClain

was based upon the officers seeing the gun. It, therefore, was not a traffic stop or investigative detention as in *Holt*, but a custodial arrest. Second, the officers all testified they saw a gun (which they did not know was a replica) and plaintiffs cite no case law indicating that training their guns and issuing commands was an unlawful way to effect a custodial arrest in these circumstances. Summary judgment is GRANTED to Linfoot on this claim.

### B. Excessive Force in Violation of Fourth Amendment

"Under the Fourth Amendment, law enforcement may use objectively reasonable force to carry out such seizures; as in the unlawful arrest analysis, this objective reasonableness is determined by an assessment of the totality of the circumstances." *Green v. City & Cty. of San Francisco*, 751 F.3d 1039, 1049 (9th Cir. 2014) (internal quotation marks omitted). To determine whether an officer's use of force was reasonable, courts must balance the nature and quality of the intrusion on a person's liberty with the countervailing governmental interests at stake. *Davis v. City of Las Vegas*, 478 F.3d 1048, 1054 (9th Cir. 2007) (internal quotations and citations omitted). This balancing act requires courts to "assess the quantum of force used" and then "measure the governmental interests at stake" by considering the following three factors: "(1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

The reasonableness of a particular use of force must be judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (citation omitted). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id.* at 396-97; *see also Alexander v. County of Los Angeles*, 64 F.3d 1315, 1320 (9th Cir. 1995) ("It is well settled that when an officer reasonably believes force is necessary to protect his own safety or the safety of the public, measures used to restrain individuals, such as stopping them at gunpoint and handcuffing them, are reasonable.").

There are material factual disputes regarding the actions of McClain prior to Linfoot firing

his gun that preclude summary judgment on this claim. First, if the jury believes Mottern – that McClain was cooperating with the officers, did not reach for his waistband, and had his hands either up or otherwise held in a way that was not indicative of reaching for a gun – then Linfoot firing shots would not be objectively reasonable because McClain did not pose an immediate threat to the officers' or the public's safety. Of course, the jury may instead believe the officers' testimony that McClain was reaching for his gun and his hands were at his waistband, endangering their and others' lives. What McClain did prior to the shots being fired, therefore, raises questions of material fact precluding summary judgment.[2]

Even if the jury believes the officers and disbelieves Mottern concluding that McClain's hands were coming down and reached his waistband – as supported partially by the forensic evidence regarding the shot that went through McClain's arm and into his chest[3] – there are still questions of material fact whether the commands being yelled at McClain were contradictory and whether McClain was simply trying to comply with a command that he should get down on the ground. In reaching this conclusion I do not rely solely on plaintiffs' expert's opinions, which was based on Clark's review of the dash cam video and testimony in the case, including his belief (as to which Linfoot objects) that an officer said "get down on the ground," but in large part on my own viewing of that video.[4] What exact commands were given (and by whom), the circumstances surrounding those commands, and what a reasonable officer or reasonable suspect would have

---

[2] Linfoot attempts to undermine Mottern's declaration by pointing out that her declaration does not explicitly say McClain's hands "were up" and that in her interview after the incident Mottern stated that McClain "didn't even have them [his hands] up all the way, and they fired shots." Delaney Reply Decl., Ex. 19:5-10. However, when read in context, Mottern's statements indicate she believed McClain's hands were up or that he was moving his hands in an upward direction when he was shot. *Id*., 16:1-3, 20:6-9, 28:20-23.

[3] I recognize that the forensic evidence does not conclusively show where McClain's *lower arms and hands* were when the shot at issue went through McClain's upper arm and into his chest.

[4] Linfoot objects to Exhibit A to the Clark declaration, as he disputes whether any officer directed McClain to "get down on the ground." Reply at 1 n.1. I overrule the objection, but for purposes of this motion, rely on my own viewing of and listening to the Dash Cam video. Linfoot also objects to plaintiffs' purported reliance on the Mottern Declaration as to contradictory commands, as the context of Mottern's declaration indicates she is discussing allegedly contradictory commands given to her after McClain was shot. Reply at 5. However, I do not rely on that portion of Mottern's declaration for purposes of denying summary judgment on this claim.

understood by those commands, are material and disputed issues that must be resolved by the jury.[5]

Linfoot's motion regarding the excessive force claim is DENIED.

### C. Fourteenth Amendment

This claim is based on the same facts as the Fourth Amendment excessive force claim. A substantive due process claim under the Fourteenth Amendment based on deprivation of the liberty interest arising out of familial relations may be asserted by the family of a person killed by law enforcement officers. *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 371 (9th Cir.1998). The Fourteenth Amendment inquiry is distinct from a Fourth Amendment excessive force claim, however. *See Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir.2010) (analyzing each claim separately). Under the Fourteenth Amendment, "only official conduct that 'shocks the conscience' is cognizable as a due process violation." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir.2008).

"In determining whether deliberate indifference is sufficient to shock the conscience, or whether the more demanding standard of purpose to harm is required, the critical consideration [is] whether the circumstances are such that actual deliberation is practical." *Tennison v. City & County of San Francisco*, 570 F.3d 1078, 1089 (9th Cir.2009) (internal quotation marks omitted) (alteration in original). This is because an officer faces a "fast paced, evolving situation presenting competing obligations with insufficient time for the kind of actual deliberation required for deliberate indifference." *Porter*, 546 F.3d at 1142. So, for example, if a suspect acts in an evasive manner that requires officers to react quickly, the officers may be held liable only if they acted with a purpose to harm. *Porter*, 546 F.3d at 1140. A purpose to harm means "a purpose to harm unrelated to legitimate law enforcement objectives." *Wilkinson*, 610 F.3d at 554; *see also Gonzalez v. City of Anaheim*, 747 F.3d 789, 797 (9th Cir.), cert. denied sub nom. *Wyatt v. F.E.V.*,

---

[5] Linfoot himself points out a dispute of material fact. Even if the jury believes that both of McClain's hands were coming down "together" prior to the shooting, plaintiffs' expert ascribes that action as one indicating McClain intended to get down on the ground and was not going for the gun while Officer Stephens testified that it was not unusual for an individual to reach for a gun with both hands. *Compare* Reply at 3 n.3 *with* Clark Decl. ¶¶ 15, 16 *and* Stephens Depo. at 22:1-9.

7

1  135 S. Ct. 676 (2014) ("Where, as here, the officers did not have time to deliberate, a use of force

2  shocks the conscience only if the officers had a 'purpose to harm' the decedent for reasons

3  unrelated to legitimate law enforcement objectives.").

4        Plaintiffs argue that Linfoot showed deliberate indifference and a purpose to harm by
5  shooting McClain with no warning when he was on the scene for 30 seconds and had time to
6  deliberate, when he had no information that McClain had committed any crime other than having a
7  purported gun in his waistband, when he did not observe the gun come out of the waistband, and
8  when McClain was attempting to comply with conflicting instructions from the officers. Plaintiffs
9  also argue that Linfoot's continuing to shoot McClain as McClain fell and once McClain was on
10 the ground despite the fact that McClain did not remove the gun from his waistband also "shocks
11 the conscience."

12       Whether the lower "shocks the conscious standard" or the higher "purpose to harm"
13 standard applies depends upon whether Linfoot had time to deliberate. Both sides agree Linfoot
14 was on the scene for approximately 30 seconds before he fired the shots. However, it was only a
15 matter of seconds between the point at which Linfoot believed McClain was dropping his hands
16 and reaching for the gun and when Linfoot fired the shots. *See, e.g., Gonzalez v. City of Anaheim*,
17 747 F.3d 789, 793 (9th Cir. 2014) (summary judgment was appropriate where record showed "no
18 time to deliberate" when officer fired the shot less than ten seconds after the suspect drove off
19 with officer trapped in the car with the suspect, and defense submitted no facts showing officer
20 had purpose to harm decedent unrelated to legitimate law enforcement objectives). Yet, if the jury
21 believes that McClain was not reaching for his waistband and/or was not dropping his hands, then
22 it does not matter which standard applies as a reasonable jury could conclude that in even within
23 those few seconds Linfoot had a purpose to harm McClain. Similarly, if the jury believes that
24 McClain was being given inconsistent commands – and that the officers on the scene should have
25 understood the commands were inconsistent – and that McClain was simply attempting to comply
26 with a command, then a jury might conclude the higher purpose to harm standard could be met.

27       Because of the material disputes of fact, summary judgment on this claim is DENIED.

28

8

### D. Qualified Immunity

The threshold inquiry in a qualified immunity analysis is whether the plaintiff's allegations, if true, establish a constitutional violation. *Wilkins v. City of Oakland*, 350 F.3d 949, 954 (9th Cir.2003) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). If so, the court proceeds to the second step of the analysis, to determine whether the actions alleged violate a clearly established constitutional right. *Wilkins*, 350 F.3d at 954. Clearly established means that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id*. (quoting *Saucier*, 533 U.S. at 202, emphasis in original). In other words, "[f]or a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *see also Boyd v. Benton Cnty.*, 374 F.3d 773, 780-81 (9th Cir. 2004). The reasonable officer avoids committing not only those acts that have been clearly established as unconstitutional, but also similar acts even where there is no case specifically addressing them, so long as existing law provides fair warning that those acts, too, are unconstitutional. *See Hope v. Pelzer*, 536 U.S. at 739–43; *Mattos v. Agarano*, 661 F.3d 433, 442 (9th Cir. 2011).

In excessive force cases, such as this one, the relevant inquiry is whether, "'under the circumstances, a reasonable officer would have had fair notice that the force employed was unlawful, and [whether] any mistake to the contrary would have been unreasonable.'" *Boyd*, 374 F.3d at 781 (quoting *Drummond v. City of Anaheim*, 343 F.3d 1052, 1060 (9th Cir.2003)). Qualified immunity is an affirmative defense and therefore the burden of proof is on the public official asserting immunity. *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1981). In determining whether qualified immunity exists, the court must "construe the facts, overwhelming or otherwise, in [plaintiffs'] favor." *Johnson v. Bay Area Rapid Transit Dist.*, 724 F.3d 1159 (9th Cir. 2013).

As above, the application of qualified immunity depends on disputed material facts. If the jury believes McClain was not dropping his hands or reaching for his waistband at the time the shots were fired, then qualified immunity could not shield Linfoot. *See, e.g., Curnow By & Through Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991) (rejecting application of

1  qualified immunity where under one witnesses' contested version of events "the police officers
2  could not reasonably have believed the use of deadly force was lawful because Curnow did not
3  point the gun at the officers and apparently was not facing them when they shot him the first
4  time.").[6]

## II. STATE LAW CLAIMS

### A. False Arrest/False Imprisonment

This claim stands on the same footing as the federal claim. Linfoot's motion for summary judgment is GRANTED on this claim.

### B. Battery (Wrongful Death)

Under California law, officers are explicitly permitted to use reasonable force to effect an arrest, prevent escape, or overcome the resistance of a person being arrested. Cal. Penal Code § 835a. Accordingly, a law enforcement officer who uses force in the course of an arrest is not liable for battery unless the plaintiff proves that the force used was unreasonable. *Edson v. City of Anaheim*, 63 Cal. App. 4th 1269, 1272-73 (Cal. Ct. App. 1998). Battery claims brought under California law are analyzed under the reasonableness standard used to evaluate Fourth Amendment claims and require the same evidentiary showing. *See id*. at 1274*; Saman v. Robbins*, 173 F.3d 1150, 1157 n.6 (9th Cir. 1999).

This claim, therefore, stands on the same footing at the excessive force claim addressed above and summary judgment is DENIED as to wrongful death under California law.

### C. Negligent Pre-Shooting Conduct

Plaintiffs argue that Linfoot's pre-shooting conduct – namely his "poor tactics" including failing to warn McClain that Linfoot was going to shoot and giving conflicting commands against his training – caused McClain's death, therefore Linfoot was negligent. Linfoot does not, either

---

[6] Defendants rely on *Hunt v. Cty. of Whitman*, No. CS-03-119-FVS, 2006 WL 2096068 (E.D. Wash. July 26, 2006), but in that case qualified immunity was applied to a "shooting an armed man who is aware of the officer's presence, who is capable of shooting the officer, who has ignored repeated instructions to put his firearm down, and who has given credible indications that he is contemplating a violent resolution of the standoff." *Id*. at *7. Here, however, McClain was (at least up until his disputed actions) generally *complying* with police directives and there were no indications he was contemplating a violent resolution to the situation.

10

in the opening brief or in reply, address this claim on its substance.

The California Supreme Court "has long recognized that peace officers have a duty to act reasonably when using deadly force." *Hayes v. Cnty. of San Diego*, 57 Cal. 4th 622, 629 (2013). The cause of action is grounded in the tort of negligence and the corresponding duty of police officers to act reasonably when using deadly force. *Id*. As the court explained, "[t]he reasonableness of an officer's conduct is determined in light of the totality of circumstances," which includes pre-shooting circumstances. *Id*. at 629-30. Those pre-shooting circumstances might show that an otherwise reasonable use of deadly force was in fact unreasonable, such as where officers negligently provoke a dangerous situation in which the subsequent use of deadly force was justified. *Id*. at 630.

However, in this case as in *Hayes*, the one injury plaintiffs allege is the loss of their son. Thus, this case involves a single primary right (plaintiffs' right not to be deprived of their son by an improper use of deadly force), which necessarily corresponds to a single duty (the duty not to use deadly force in an improper manner), and the breach of that duty gives rise to a single indivisible cause of action. *Id*. at 631. In other words, plaintiffs cannot allege a separate negligence cause of action solely based on the pre-shooting conduct because they have not alleged an injury other than the death of McClain. As plaintiffs here do not allege a separate injury from the pre-shooting conduct by Linfoot, the pre-shooting conduct "is only relevant here to the extent it shows, as part of the totality of circumstances, that the shooting itself was negligent." *Id*.

Therefore, to the extent that plaintiffs attempt to allege a separate negligence claim based solely on pre-shooting conduct, Linfoot is granted summary judgment as to that claim. Under *Hayes*, however, the officers' pre-shooting conduct is relevant to the negligent use of deadly force claim discussed below.

### D. Negligent Use of Deadly Force

"To support a claim of negligent wrongful death against law enforcement officers, a plaintiff must establish the standard elements of negligence: defendants owed a duty of care; defendants breached their duty; and defendants' breach caused plaintiff's injury." *Hayes v. Cty. of San Diego*, 736 F.3d 1223, 1231 (9th Cir. 2013). "The California Supreme Court has held that 'an

officer's lack of due care can give rise to negligence liability for the intentional shooting death of a suspect," and that "police officers have a duty to use reasonable care in employing deadly force." *Id*. at 1232 (quoting *Munoz v. Olin*, 24 Cal.3d 629, 634(1979)).

This claim survives for the same reason as plaintiffs' excessive force claim; the material factual disputes regarding the actions of McClain prior to Linfoot firing his gun preclude summary judgment.[7] Whether the officers' actions were *reasonable* under the totality of the circumstances they faced (*see, e.g.*, *Hayes*, 57 Cal. 4th at 629-30), depends upon the jury's resolution of the disputed facts. Linfoot's motion for summary judgment is DENIED on this claim.

**E. Bane Act**

Section 52.1 of the California Civil Code, also known as the Bane Act, creates a right of action against any person who "interferes by threat, intimidation, or coercion . . . with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or . . . of this state." Cal. Civ. Code § 52.1(a). The parties dispute the extent to which section 52.1 requires a showing of "threat, intimidation, or coercion" distinct from the underlying constitutional violation itself.

In *Shoyoye v. Cnty.* of Los Angeles, 203 Cal. App. 4th 947 (2012), the court clarified that the Bane Act "was intended to address only egregious interferences with constitutional rights, not just any tort. The act of interference with a constitutional right must itself be deliberate or spiteful." *Id*. at 959. The court also explained that the statute requires a showing of coercion independent from the coercion "inherent" in the constitutional deprivation. *Id*. at 962. Courts have pointed out that the constitutional deprivation in *Shoyoye* – wrongful incarceration – was due to an error and not intentional conduct, hence the need to show some form of coercion, intimidation, or harassment independent from the act alleged to have violated the victim's constitutional right. *See, e.g., Jones v. Cty. of Contra Costa*, No. 13-CV-05552-TEH, 2016 WL 1569974, at *6 (N.D. Cal. Apr. 19, 2016); *see also Sandoval v. Cty. of Sonoma*, No. 11-CV-

---

[7] However, "state negligence law, which considers the totality of the circumstances surrounding any use of deadly force . . . is broader than federal Fourth Amendment law, which tends to focus more narrowly on the moment when deadly force is used." *Hayes*, 57 Cal. 4th at 639 (internal citations omitted).

12

05817-TEH, 2016 WL 612905, at *3 (N.D. Cal. Feb. 16, 2016) (where the constitutional deprivation was an unlawful search and seizure, the court followed *Lyall v. City of Los Angeles*, 807 F.3d 1178 (9th Cir. 2015) held "that a Bane Act search and seizure claim requires threats, intimidation or coercion separate from the coercion inherent in the search and seizure itself."). For example, where the Bane Act violation is based on allegations of an unlawful arrest where there was *also* excessive force in effectuating that arrest, a Bane Act claim can be stated. *See, e.g., Stubblefield v. City of Novato*, No. 15-CV-03372-JCS, 2016 WL 192539, at *11 (N.D. Cal. Jan. 15, 2016) (discussing cases).

As to stand-alone claims of excessive force unaccompanied by sufficient claims of unlawful arrest, courts in this district are split as to whether allegations of threats, intimidation, or coercion are required *independent* of the coercion inherent in the underlying § 1983 excessive force claim. *Compare Jones v. Cty. of Contra Costa*, No. 13-CV-05552-TEH, 2016 WL 1569974, at *6 (N.D. Cal. Apr. 19, 2016) ("the relevant distinction for purposes of the Bane Act is between intentional and unintentional conduct, and [ ] *Shoyoye* applies only when the conduct is unintentional. . . . Here, Plaintiff alleges intentional conduct by the Defendants in the form of excessive force; therefore, Plaintiff need not allege a showing of threats, intimidation or coercion independent from the coercion inherent in the use of force.") *with Velarde v. Union City Police Dep't*, No. 13-CV-04011-JD, 2015 WL 6871579, at *6 (N.D. Cal. Nov. 9, 2015) (where defendants dropped their unlawful arrest claim and "do not allege separate acts of violence, threats or coercion beyond their excessive force claims, their Bane Act claims fail.").

In *Chaudhry v. City of Los Angeles*, 751 F.3d 1096 (9th Cir.), *cert. denied sub nom. City of Los Angeles, Cal. v. Chaudhry*, 135 S. Ct. 295 (2014), the Ninth Circuit agreed that the elements of an excessive force claim under § 1983 "establish" the elements of a Bane Act claim under § 52.1. *Id*. at 1105. The court did not require any additional elements. *Id*. This makes sense because an excessive force claim *by its nature* includes coercion beyond that inherent, for example, in an arrest or detention or search and seizure. I agree with my colleagues who have determined that allegations of excessive force are sufficient by themselves to allege a violation of the Bane Act. *See, e.g., Jones v. Cty. of Contra Costa*, No. 13-CV-05552-TEH, 2016 WL

13

1569974, at *6 (N.D. Cal. Apr. 19, 2016); *Stubblefield v. City of Novato*, No. 15-CV-03372-JCS, 2016 WL 192539, at *11 (N.D. Cal. Jan. 15, 2016) ("The Court holds that Stubblefield's allegations of excessive force by the Defendant Officers are sufficient to state a claim under section 52.1."); *Rodriguez v. City of Modesto*, No. 10-CV-1370, 2013 WL 6415620, at *13 (E.D. Cal. Dec. 9, 2013) ("[a] Plaintiff bringing a Bane Act excessive force [claim] need not allege a showing of coercion independent from the coercion inherent in the use of force.").

Linfoot's motion for summary judgment on the Bane Act claim, therefore, is DENIED.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is GRANTED in part and DENIED in part. Defendants' motion must be denied as to the claims against Linfoot of excessive force under federal and state law, the wrongful death claims, and the Bane Act claim based on excessive force. However, no material disputes of fact have been raised to prevent granting summary judgment to Linfoot on plaintiffs' false arrest/false imprisonment claims under federal and state law and plaintiffs' stand-alone negligence claim based solely on pre-shooting conduct.

**IT IS SO ORDERED**.

Dated: September 1, 2016



WILLIAM H. ORRICK
United States District Judge